DUDLEY SPORTS CO., INC. *v*. LAWRENCE ROBERT SCHMITT
B/N/F JOSEPH SCHMITT.

[No. 1170A193. Filed February 22, 1972. Rehearing denied April 4, 1972.
Transfer denied November 1, 1972.]

218

*Peter B. Stewart, James J. Stewart, Stewart, Irwin, Gilliom, Fuller & Meyer,* of Indianapolis, for appellant.

*John T. Hume, III, Smith and Jones, Jesse W. Peden,* of Indianapolis, for appellee.

BUCHANAN, J.—STATEMENT OF THE CASE AND FACTS—This is an appeal of a personal injury products liability case (baseball pitching machine) by the defendant-appellant, Dudley Sports Co., Inc., of New York (Dudley), from a jury verdict awarding $35,000.00 to the plaintiff-appellee, Lawrence Schmitt (Schmitt).

On March 24, 1965, Danville High School (the High School) purchased an automatic baseball pitching machine (the machine), purportedly designed and manufactured by Dudley, from Em-Roe Sporting Goods Company, of Indianapolis, Indiana (Em-Roe). Dudley's name, "Dudley Automatic Pitching Machine Dudley Sports Co., Inc.," was affixed to the machine by a metal tag, but the machine was manufactured by Commercial Mechanisms, Inc., of Kansas City, Missouri, under a written agreement by which Dudley was to be the

exclusive distributor. However, none of Dudley's advertising material or the metal tag on the machine disclose this arrangement.

The machine consists of a frame and an open extended metal throwing arm. No protective shield guards the throwing arm, which operates in a clockwise cycle, triggered by a large coiled spring at the base of the machine. A ball rack at the top of the machine loads the arm when it is in a horizontal nine o'clock position. When the arm reaches a ten o'clock energized position, after receiving a ball, energy is released from the coiled spring and transmitted to the arm by tension on a steel cable running between the coiled spring and the arm causing the arm to pass through a clockwise pitching cycle at a high rate of speed, coming to rest in a four o'clock position. The arm can then be returned to the ten o'clock energized position by using the electric motor (located near the base of the machine) to rewind the spring, or by deliberate manual operation of the arm to that position. The only purpose of the electric motor is to automatically rewind the spring, which eliminates the necessity of manually returning the throwing arm to the energized ten o'clock position. Thus the machine is still capable of delivering a powerful blow when in the ten o'clock position even though it is unplugged.

Evidence showed that if the throwing arm is in the ten o'clock energized position, it can be set off by any slight vibration or a change in atmospheric conditions. If it is between the four o'clock rest position and the ten o'clock dead center (unstable) position, the machine is "stable" and it will not go off spontaneously. The danger of triggering the arm increases as it moves in a counter-clockwise position towards ten o'clock.

Upon receipt of the machine by the High School, it was uncrated by the vice principal, Glenden Gibbs (Gibbs), and the baseball coach, John Trotter (Trotter). In addition to the machine, the crate also included a parts list, assembly in-

structions, and a tool to deactivate the coiled spring. The only warning instructions found in the crate was a general warning tag which said:

"WARNING! SAFETY FIRST

READ INSTRUCTIONS
BEFORE ROTATING MACHINE
EITHER ELECTRICALLY OR
MANUALLY

STAY CLEAR OF
THROWING ARM
AT ALL TIMES!

REMOVE THIS
DON'T PACKING BLOCK
UNTIL YOU
FULLY UNDERSTAND THE
OPERATION OF THE ARM
AND
THE DANGER INVOLVED"

However, no operating instructions were included in the crate. (Presumably, the missing operating instructions would inform the purchaser as to the specific operation of the machine and the exact dangers that might be encountered in the use of the machine, such as the conditions which would cause the throwing arm to be energized and the fact that the machine is capable of delivering a powerful blow even though unplugged.) Moreover, no information was supplied as to the use of the tool which deactivates the coiled spring (energy source).

The machine was then tested by Gibbs and Trotter for one-half hour. They found that the throwing arm was bent, so minor adjustments were required to improve the accuracy of the machine. Trotter testified that he put the arm in the resting six o'clock position and stored the machine, unplugged, behind locked doors in locker room No. 2. However, the two adjoining locker rooms, with inside entrances to locker room No. 2, were not locked from their outside hallway

entrance. It would have been possible to enter the unlocked doors of rooms No. 1 or No. 3 to gain access to locker room No. 2.

The next day, Schmitt, who was a student at the High School, was sweeping in locker room No. 2 as he had done several times in the past at the request of the coaching staff. He said that as he approached the front of the machine, he heard a whistling noise and a pop. He could not remember whether his broom touched the machine, but the next thing he knew was that he had been hit in the face by the throwing arm, causing extensive facial injuries. These injuries consisted of deep cuts and lacerations on Schmitt's upper lip, nose and above his right eyebrow, a partially severed nose, a crushed left sinus cavity, skull bone exposure, and two chipped teeth.

Four surgical operations were subsequently required to remedy these facial injuries, leaving Schmitt with permanent facial scars.

A short time before the accident, Schmitt and two other students viewed the machine and then they departed. All three of them testified that they did not tamper with the machine, but the football coach, Mr. Pedigo, testified that Schmitt's two companions related to him that they saw Schmitt tampering with the machine just before the accident. They denied making such statements and they did not remember seeing the machine in the energized ten o'clock position.

Schmitt brought an action against the High School, Em-Roe, and Dudley, alleging negligence in design, manufacturing, and storage of the machine. Schmitt in his Complaint alleged that Dudley was negligent in designing and manufacturing the machine with no protective shield or guard around the arm and in failing to supervise and control its agent, Em-Roe.

A verdict of $35,000.00 was rendered by the jury in favor of Schmitt, and Dudley now appeals.

The facts and events during trial relating to ISSUES FOUR, FIVE, and SIX will be set out separately in the DECISION as each issue is discussed.

ISSUES—Dudley raises some twenty-five points of error, which we have sorted out into six issues:

ISSUE ONE. Is a vendor of a product who holds himself out as the manufacturer of that product and labels the product as such, to be held to the same standard of care in the design, manufacture, and sale of that product as the manufacturer?

ISSUE TWO. Was the evidence sufficient to support the jury's conclusion that Dudley was negligent in the design, manufacture, and sale of the machine?

ISSUE THREE. Were the damages awarded excessive?

ISSUE FOUR. Did the trial court err in the admission of Schmitt's Exhibits 52, 53, 60, and 61?

ISSUE FIVE. Did the trial court err in giving plaintiff's Tendered Instructions No. 2, No. 9, No. 11, and No. 12, and refusing to give Dudley's Tendered Instructions No. 4, No. 9, and No. 11?

ISSUE SIX. Was it reversible error for the trial judge to direct Schmitt's attorney, in the jury's presence, not to point the machine toward the bench or the jury?

## DECISION

To avoid repetition, we restate certain familiar propositions. This court must view the evidence in a light most

favorable to the appellee. *Jessop* v. *Werner Transportation Co.* (1970), 147 Ind. App. 408, 261 N. E. 2d 598; *Dent* v. *Dent* (1961), 241 Ind. 606, 174 N. E. 2d 336. It is not the province of this court to weigh the evidence or pass upon the facts; the verdict of the jury will be taken as conclusive and will not be disturbed unless it is clearly erroneous or shows that the jury's decision was influenced by passion, prejudice or corruption. *Union Traction Co. of Indiana* v. *Gaunt* (1922), 193 Ind. 109, 135 N. E. 486; *Indianapolis Newspapers, Inc.* v. *Fields* (1970), 254 Ind. 219, 259 N. E. 2d 651; *Muehlman* v. *Keilman* (1971), 257 Ind. 100, 272 N. E. 2d 591; *Legler* v. *Legler* (1971), 149 Ind. App. 447, 273 N. E. 2d 303.

ISSUE ONE. It is our opinion that a vendor who holds himself out as the manufacturer of a product and labels the product as such must be held to the same standard of care as if he were in fact the manufacturer.

This is a question of first impression in Indiana. The discernible emerging trend is that one who labels a product with his own name and represents the product to be his own will be held to the same standard of care as if he had manufactured it. We adopt as the law of Indiana what appears to be the prevailing modern rule and in doing so we look to an abundance of well-reasoned authority, particularly the *Restatement of Torts* (2d) § 400, which flatly states:

"One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

See also *Sears, Roebuck & Co.* v. *Marris* (1962), 273 Ala. 219, 136 So. 2d 883; *Wagner* v. *Larson* (1962), 257 Iowa 1202, 136 N. E. 2d 312; *Wojciuk* v. *U. S. Rubber Co.* (1960), 13 Wis. 2d 173, 108 N. W. 2d 149; *Carney* v. *Sears, Roebuck & Co.* (4th Cir. 1962), 309 F. 2d 300; *Burkhardt* v. *Armour & Co.* (1932), 115 Conn. 249, 161 A. 385; *Thornhill* v. *Carpenter-Morton Co.* (1915), 220 Mass. 593, 108 N. E. 474; *Comm'r of the State Insurance Fund* v. *City Chemical*

*Corp.* (1943), 290 N. Y. 64, 48 N. E. 2d 262; 1 Harper and James, *Law of Torts*, 594, § 28.28 (1956). Thus, a vendor is liable not only for his own negligence but also for any negligence on the part of the actual manufacturer, even though the vendor could not reasonably discover the defect. *Carney* v. *Sears, Roebuck & Co., supra; Farmer & Co.* v. *Leasure* (1939), 177 Md. 393, 191 A. 2d 572; *Slavin* v. *Francis H. Leggett & Co.* (1935), 114 N. J. L. Rep. 421, 177 A. 120.

The reason for imposing such liability is not hard to find. When a vendor puts his name exclusively on a product, in no way indicating that it is the product of another, the public is induced to believe that the vendor was the manufacturer of the product. This belief causes the public to rely upon the skill of the vendor. When products are held out in this manner, the ultimate purchaser has no available means of ascertaining who is the true manufacturer. By this act of concealment, the vendor vouches for the product and assumes the manufacturer's responsibility as his own.

The mechanism manufactured by Commercial Mechanisms, Inc., of Kansas City, Missouri, bore Dudley's name only, as did advertising material. The caption contained in Dudley's catalog, entered as Plaintiff's Exhibit No. 59, reads "Dudley 'Olympia' Automatic Baseball Pitching Machine." The catalog also includes Dudley's New York address, telephone number, and a discussion of the machine's characteristics but makes no reference to Commercial Mechanisms. The record discloses no revelation on the part of Dudley in the advertising, distribution, and sale of the machine that Commercial Mechanisms, Inc. was the manufacturer.

While Dudley never positively states that it is the manufacturer, no reasonable grounds exist to believe otherwise. The only implication is that Dudley is the manufacturer and therefore should be held to the same standard of care as a manufacturer. *Swift & Co.* v. *Blackwell* (4th Cir. 1936), 84 F. 2d 130.

ISSUE TWO. It is our opinion that the evidence most favorable to Schmitt was sufficient for the jury to conclude that Dudley was negligent in the design, manufacture, and sale of the machine.

Point A.

Schmitt contends that Dudley was negligent for failing to provide a shield around the pitching arm; for failing to provide a lock or catch mechanism on the machine by which the pitching arm could be locked; and for failing to give specific instructions as to the operation of the machine. Dudley replies that a manufacturer is under no duty to design an accident-proof product; that their duty was limited only to the use of reasonable care; that the danger from the lack of a protective shield around the throwing arm was an obvious danger, and therefore no warning was necessary.

While we recognize the validity of the argument that a manufacturer may not be liable for obvious dangers, it is also the law that a manufacturer and vendor are bound to avoid *hidden defects or concealed dangers* in their products. *J. I. Case Co.* v. *Sandefur* (1963), 245 Ind. 213, 197 N. E. 2d 519; *Strickler* v. *Sloan* (1956), 127 Ind. App. 370, 141 N. E. 2d 863; *Eahora* v. *Harnischfeger Corp.* (7th Cir. 1958), 404 F. 2d 172; *Indiana Natl. Bank of Indianapolis* v. *De Laval Separator Co.* (7th Cir. 1968), 389 F. 2d 674. Their products must not be traps for the unwary.

The lack of a guard around the arm was probably obvious to all potential users of the machine. But the extent of the hazards involved from the lack of a guard was not apparent. The potential risks of harm to the users of this machine lie first in its ability to deliver a swift, crippling blow even though unplugged. Secondly, whether connected or disconnected, if the throwing arm is in the ten o'clock position, a slight vibration or even a change in atmospheric conditions will trigger the throwing arm. This ability to operate while unplugged as a result of even a slight vibration is a latent

danger which could only be discovered through an examination of the machine combined with knowledge of the engineering principles which produce the action of the machine. Such knowledge is not ordinarily possessed by a sixteen-year-old high school boy who had never seen the machine before.

In spite of these concealed dangers, Dudley asserts that placing a screen around the throwing arm would create a false sense of security, thereby attracting curious persons to place their fingers inside the screen. We are not persuaded by this argument. The utilization of such a protective screen would, in fact, be actual notice of the danger. Those placing their fingers inside the screen would do so at their own risk, as would one who touches the blade of a power saw. Without a screen, however, there is no notice of, or protection from, the inherent dangers of this machine. As a result, the false sense of security is created when there is no screen.

There was reasonable evidence of probative value sufficient to support a conclusion by the jury that this machine is a potentially dangerous mechanism capable of inflicting injury to life or limb to those unaware of its hazards. Dudley was bound to provide a machine reasonably safe for its intended use. Because this machine was recommended for high school use, we think that the jury could reasonably have concluded that it was not safe for use by high school students.

Point B.

The law requires a supplier of an imminently dangerous chattel to *warn all who may come in contact* with the chattel of any concealed danger, regardless of privity of contract. *Strickler* v. *Sloan, supra.*

Although a manufacturer or vendor is under no duty to warn of apparent dangers, this court has adopted the rule of *Campo* v. *Scofield* (1950), 301 N. Y. 468, 95 N. E. 2d 802, which held that: ". . . in cases dealing with a manufacturer's liability for injuries to remote users, the stress has always been upon the duty of guarding against *hidden* defects and

of giving notice of concealed *dangers.*" *Strickler* v. *Sloan, supra,* at 385. See also *Indiana Natl. Bank of Indianapolis* v. *De Laval Separator Co., supra; Eck* v. *E. I. Du Pont & Co.* (7th Cir. 1968), 393 F. 2d 197.

Dudley argues that because a general warning tag was sent to the High School, no liability can be attached to Dudley for Schmitt's injuries. Dudley did include a *general* warning tag in the shipping crate cautioning the High School to read the operating instructions before using the machine. However, this general warning tag merely conveyed an implication that the machine would only be dangerous when in operation. No warning was given of the latent dangers of this machine. Nothing was mentioned about its triggering capabilities while unplugged. Thus, a more specific warning was required to fulfill Dudley's duty to warn.

The specific operating instructions referred to by the general warning tag were not included in the crate. Presumably, these instructions would have informed the purchaser as to the various positions of the throwing arm, the positions which were dangerous, that the machine was capable of being triggered even though unplugged, and that triggering the machine only required a slight vibration or change in atmospheric conditions.

A prying tool to deactivate the coiled spring was included in the crate sent to the High School. This prying tool was evidently *the* safety feature of this machine. But there was no information on how to use this tool, or any indication what it was. The missing operating instructions could also be expected to include the information regarding this tool.

In *Eck* v. *E. I. Du Pont & Co., supra,* an employee of the purchaser of dynamite was injured while standing within the danger zone of the exploding dynamite. The court held that it was a question for the jury whether a four-page warning pamphlet contained in the cartons of dynamite discharged Du Pont's duty to *specifically* warn the purchaser of the inherent

dangers in the use of the dynamite, even though the purchaser had read the contents of the general warning pamphlet.

Although a manufacturer may assume that the purchaser will properly use the product and avoid obvious dangers, such reliance is improper if the product contains latent dangers and no notice is given thereof. Because no specific operating instructions were sent to the High School and no warning was given as to the specific latent dangers of the machine, it was reasonably foreseeable that a high school student might be the victim of such negligence. Thus, it was reasonable for the jury to find from the evidence before them that Schmitt's injuries were the natural and probable consequence of Dudley's negligence. *Strickler* v. *Sloan, supra.*

There is no vitality in Dudley's argument that the machine was in keeping with modern scientific advancement in the baseball pitching machine industry and that it was an advancement when compared to the other models on the market. The fact that a particular product meets or exceeds the requirements of its industry is not conclusive proof that the product is reasonably safe. In fact, standards set by an entire industry can be found negligently low if they fail to meet the test of reasonableness. *The T. J. Hooper* (2d Cir. 1952), 60 F. 2d 737.

Likewise, the fact that experts testified that the machine was reasonably safe is not conclusive proof that it was in fact a reasonably safe machine. The weight to be given expert testimony is for the jury to decide. They are not bound by an expert's opinion and they may even disregard it if they so desire. *White* v. *Crow* (1964), 245 Ind. 276, 198 N. E. 2d 222; *Klinger* v. *Caylor* (1971), 148 Ind. App. 508, 267 N. E. 2d 848; *Kavanagh* v. *Butorac* (1966), 140 Ind. App. 139, 221 N. E. 2d 824.

The jury could well have found that Dudley violated its duty to notify the High School, and ultimately Schmitt, of the machine's inherent dangers.

## Point C.

Dudley stresses the fact that Trotter testified he stored the pitching machine behind locked doors in locker room No. 2 with the pitching arm in the six o'clock resting position. Schmitt and his two friends testified that they did not disturb the pitching arm. Therefore, Dudley concludes that the pitching arm was in the six o'clock position when Schmitt was injured, and since the arm cannot be triggered from the six o'clock position, Schmitt's theory of the accident is contrary to physical facts and scientific principles. On this basis, Dudley asserts that the jury's decision was contrary to the evidence presented.

This position has a marshmallow-like quality. Dudley overlooks the fact that Trotter also testified he only locked the hallway door to locker room No. 2, while leaving the hallway doors to adjacent locker rooms Nos. 1 and 3, with inside entrances to No. 2, unlocked. Therefore, it was possible for an interloper to enter either locker room No. 1 or No. 3 and use inside entrances to gain access to locker room No. 2. The other weakness of this position is that the credibility of a witness is for the jury to decide. The jury may refuse to believe any testimony, even when it is uncontradicted, so long as such refusal is not arbitrary. *Calvert* v. *London* (1965), 137 Ind. App. 595, 210 N. E. 2d 376. Obviously they did not believe Mr. Trotter.

## Point D.

Dudley seeks refuge from liability by resort to the doctrine of intervening cause. If the machine was not secured under lock and key, someone must have taken the arm out of the six o'clock position which Trotter stored it in. Therefore, an intervening cause arose relieving Dudley of any liability.

Assuming a mysterious stranger tampered with the machine (which there is no evidence to support), Dudley would

still be liable for Schmitt's injuries. Where harmful consequences are brought about by intervening and independent forces, the operation of which should have been foreseen, the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent force. The original wrongful act will still be treated as the proximate cause of the accident. *New York Central R. R. Co.* v. *Cavinder* (1965), 141 Ind. App. 42, 211 N. E. 2d 502.

It could have been foreseen that the High School, bereft of knowledge of the latent dangers involved in this machine, might not store it properly and that such a mechanism could attract the attention of curious individuals, thereby inducing them to tamper with the machine. The chain of causation is not broken in this state of affairs.

ISSUE THREE. It is our opinion that the damages awarded below were not excessive.

In *Kavanagh* v. *Butorac* (1966), 140 Ind. App. 139, 221 N. E. 2d 824, this court held that in order to reverse an award for damages, the damages "must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption." *New York Central R. R. Co.* v. *Johnson* (1955), 234 Ind. 457, 127 N. E. 2d 603; *Jones* v. *Cary* (1941), 219 Ind. 268, 37 N. E. 2d 944; *Northern Indiana Public Service Co.* v. *Otis* (1969), 145 Ind. App. 159, 250 N. E. 2d 378. A verdict will not be set aside as excessive where there is nothing to show that the jury were influenced by improper considerations or that they misunderstood or misapplied the evidence. *Indianapolis St. Ry. Co.* v. *Robinson* (1901), 157 Ind. 414, 61 N. E. 936. Thus, the amount awarded cannot be considered as excessive if it is within the scope of the evidence presented. *Smith* v. *Glesing* (1969), 145 Ind. App. 11, 248 N. E. 2d 366.

Schmitt's injuries resulting from this accident included a partially severed nose, a crushed left sinus cavity, an exposed skull bone, two chipped teeth, and multiple lacerations over the forehead, nose, cheek, and lip. Side effects from the accident included shock, headaches, insomnia, and a heavy concentration of mucus throughout the nose. Four surgical operations were required to correct these injuries.

We can hardly say that the jury's award went beyond the evidence or that they were motivated by passion, prejudice, or corruption.

ISSUE FOUR. It is our opinion that the trial court did not err in the admission of Plaintiff's Exhibits Nos. 52, 53, 60, and 61.

Point A.

Dudley claims the trial court committed reversible error by admitting Schmitt's Exhibits Nos. 52 and 53. These exhibits are color photographs of Schmitt's face while on the operating table showing the nature and extent of his injuries; they are described by Dudley as gruesome.

As a general rule, a photograph proved to be a true representation of the person, place, or thing which it purports to represent is competent evidence to visually display that which a witness may verbally describe. *Midwest Oil Co.* v. *Storey* (1961), 134 Ind. App. 137, 178 N. E. 2d 468; *Hawkins* v. *State* (1941), 219 Ind. 116, 37 N. E. 2d 79; *Whal* v. *State* (1951), 229 Ind. 521, 98 N. E. 2d 671. Such photographs are admissible if relevant, even though they may be repulsive or gruesome. Evidence material to the establishment of a cause of action is not improper or inadmissible merely because it is damaging to the opposing party. *City of Terre Haute* v. *Deckard* (1962), 243 Ind. 289, 183 N. E. 2d 815.

These exhibits corroborated Dr. Robert Raber's testimony regarding the nature and extent of Schmitt's injuries and the relationship between Schmitt and the baseball machine at

the time of the accident. Thus they were relevant and material to Schmitt's cause of action.

## Point B.

Dudley objects to the trial court's admission of Schmitt's Exhibits 60 and 61. These exhibits were records pertaining to the purchase *by the High School* of a new pitching arm for the machine one week after the accident.

In negligence actions, an admission of negligence is often sought to be inferred from remedial conduct by the defendant subsequent to the happening of an accident. *Goshen* v. *England* (1889), 119 Ind. 368, 21 N. E. 977. Such evidence is generally inadmissible, even though it seems to suggest a consciousness of the wrong. *Terre Haute & Indianapolis R.R. Co.* v. *Clem* (1889), 123 Ind. 15, 23 N. E. 965.

However, the reasons to declare evidence of subsequent remedial conduct inadmissible are not appropriate when the evidence is relevant to prove facts other than negligence. 2 Jones, *The Law of Evidence*, § 387. Exhibits 60 and 61 were not evidence of repair *by Dudley*, or Dudley's subsequent admission by conduct of a dangerous condition. Nor were the exhibits used to prove negligence on the part of Dudley; they are evidence indicating that Gibbs and Trotter were not satisfied with the operation of the bent throwing arm and hand. A reasonable person could not infer from this evidence that a defect existed which could be attributed to Dudley.

Exhibits 60 and 61 could be used to prove facts other than Dudley's negligence. Although not relevant, Dudley has not shown that they were prejudiced or that the jury's decision was influenced by the admission of these exhibits. Error in the admission of evidence will be adjudged harmless when it is of a character not substantially affecting the rights of the parties. *Swallow Coach Lines* v. *Cosgrove* (1938), 214 Ind. 532, 15 N. E. 2d 92. We think there

was sufficient evidence of negligence to support the jury's verdict regardless of the effect of these exhibits.

ISSUE FIVE. It is our opinion that the trial court did not err in giving Schmitt's Tendered Instructions No. 2, No. 9, No. 11, and No. 12 and refusing to give Dudley's Tendered Instructions No. 4, No. 9, and No. 11.

Point A.

Dudley claims the court erroneously gave Schmitt's Tendered Instruction No. 2 but failed to give Dudley's Tendered Instruction No. 4. Objection was made to Schmitt's Instruction No. 2 for the reason that it failed to apprise the jury that the injuries complained of must be the natural and probable consequence of *negligence*. Dudley asserts that its Tendered Instruction No. 4 was a proper substitute.

This contention is without merit. The first paragraph, and the most important, of Schmitt's Tendered Instruction No. 2 reads:

> "Proximate cause is that act or omission which, in natural, foreseeable and continuous sequence, unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred."

We find it significant that this instruction is identical to Indiana pattern jury instruction No. 5.81 on "Proximate Cause" with the exception that Schmitt interjected the word "foreseeable." By using the word "foreseeable," Schmitt additionally instructed the jury that the mere possibility of injury is not sufficient. Foreseeability indicates probability. Schmitt's use of the words "natural, foreseeable and continuous" did properly instruct the jury that the injury must be a natural and probable result of the negligence. Thus, we find no reversible error in Schmitt's Instruction No. 2.

Point B.

Dudley finds fault with Instruction No. 9 because it failed to recognize a limit to the manufacturer's duty to use reasonable care.

While Dudley may be technically correct as to this instruction standing alone, we think that the jury was adequately instructed upon the standard of reasonable care as the trial court gave Schmitt's Tendered Instructions No. 1 and No. 15, Dudley's Tendered Instruction No. 1, and the trial court's own Instruction No. 12. Instructions must be considered as a whole to determine if the jury was fairly and properly instructed. *Palmer* v. *Decker* (1970), 253 Ind. 593, 255 N. E. 2d 797. Therefore, reading the instructions together, as they must be, the jury was adequately instructed as to the limits of a manufacturer's duty to use reasonable care.

Point C.

Dudley objected to the giving of Schmitt's Tendered Instruction No. 11 in that it instructs the jury on an issue of law, *i.e.*, the duty to warn, which was not an issue presented by the pleadings.

Dudley fails to consider Rule TR. 15 (B), which states:

"When *issues not raised by the pleadings are tried by express or implied consent of the parties,* they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, *but failure so to amend does not affect the result of the trial of these issues. . . .*" (Emphasis supplied.)

See *General Outdoor Advertising, Inc.* v. *La Salle Realty Corp.* (1966), 141 Ind. App. 247, 218 N. E. 2d 141.

At no time during the trial when these issues were raised did Dudley object. So the issue of warning was tried by implied consent of the parties.

The exclusion of Dudley's Tendered Instruction No. 9, instructing that a plaintiff can only recover on the negligence as charged in the complaint, was properly excluded for the same reason. Rule TR. 15 (B).

Dudley's objection to the admission of Schmitt's Tendered Instruction No. 12 and the exclusion of Dudley's Tendered Instruction No. 11 comprise the same objections and arguments discussed under Issue One regarding the liability of a vendor who represents himself to be a manufacturer. No further discussion is needed here.

ISSUE SIX. The trial court did not commit reversible error by directing Schmitt's counsel, in the presence of the jury, not to point the machine towards the judge or the jury.

This colloquy between the trial judge and Schmitt's counsel took place during the presentation of Schmitt's case:

"MR. HUME Your Honor at this time we ask for a recess, so Mr. Servaas can prepare the machine.

THE COURT Well, it is all right with the court. I would suggest,—which way is that thing pointing! I would suggest that you point it in a direction that is not either towards the Jury or towards me.

MR. HUME Well, with all due respect to your Honor, I have to point it to you so the Jury can,—

THE COURT Well, you're not going to point it at me, I will tell you right now! You can point it the other way, but you are not pointing it this way. . . ."

Dudley did not object, ask that the jury be instructed to ignore these remarks, or request a mistrial.

Error not grounded upon an objection timely made during the trial is not available for argument on appeal. *Rickner* v. *Haller* (1954), 124 Ind. App. 369, 116 N. E. 2d 525. ■ Objections not presented to the trial court will not be available to reverse its judgment on appeal. *Widmer* v. *Sweeney* (1955), 234 Ind. 263, 124 N. E. 2d 385. Thus, an appellant is confined to the specific objections he made in the trial court below.

Exclamations or comments by the court during the course of a jury trial were brought into perspective in *Fabian* v. *Goldstone* (1952), 123 Ind. App. 49, 53, 103 N. E. 2d 920, where Judge Crumpacker said:

"However assuming, for the sake of the discussion, that the Judge's remarks were improper and constituted an irregularity in the proceedings of the court, they certainly did not constitute an error of law relief from which could be deferred until a motion for a new trial was filed. Appellant was bound to seek relief immediately through a motion that such remarks be withdrawn and the jury admonished. If the prejudice was so severe that it could not be cured in that manner then the appellant's remedy was a motion for a mistrial. She sought neither remedy and made no complaint until she filed her motion for a new trial. Thus she waived the question and took her chances on a favorable verdict. *Umbstead* v. *Preachers Aid Soc., etc.* (1944), 223 Ind. 96, 58 N. E. 2d 441."

Dudley did not object to these remarks during the trial and thereby chose to gamble on a favorable verdict. Having failed to seize fate by the throat at the opportune moment, any alleged error has been waived and may not be urged as grounds for reversal.

Dudley alleges other trial errors and irregularities. We have examined them carefully and have found no evidence that they were prejudicial to Dudley or influenced the jury's decision. As a result, these other "errors and irregularities" present no substantial question for review.

In conclusion, we believe that the jury properly found that Dudley was negligent in the design, manufacture, and sale of an imminently dangerous mechanism containing latent defects of which Schmitt had no proper warning.

The decision of the trial court is therefore affirmed.

Robertson, P.J. (by designation), and Sullivan, J., concur. White, P.J., not participating.

NOTE.—Reported in 279 N. E. 2d 266.